**IN THE COURT OF APPEALS OF IOWA**

No. 25-0496
Filed June 18, 2025

**IN THE INTEREST OF A.R. and G.R.,**
**Minor Children,**

**K.R., Mother,**
        Appellant,

**J.R., Father,**
        Appellant.
_____

        Appeal from the Iowa District Court for Dallas County, Erica Crisp, Judge.


        Parents separately appeal the termination of their parental rights to their children. **AFFIRMED ON BOTH APPEALS.**


        Donna M. Schauer of Schauer Law Office, Adel, for appellant mother.

        Chira L. Corwin of Corwin Law Firm, Des Moines, for appellant father.

        Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

        Sarah Dewein of Cunningham & Kelso, P.L.L.C., Urbandale, attorney and guardian ad litem for minor children.


        Considered without oral argument by Greer, P.J., Buller, J., and Bower, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**BOWER, Senior Judge.**

The parents separately appeal the termination of their parental rights to their children, born in 2015 and 2017. Both claim the State failed to prove the grounds for termination, termination is not in the children's best interests due to the bond the children share with the parents, and the court should have permitted a six-month extension for reunification. Upon our review, we affirm both appeals.

## I.    *Background Facts and Proceedings*

The family came to the attention of the Iowa Department of Health and Human Services (the department) in the fall of 2022, after the paternal grandmother reported observing a sexual act between the parents' two teenage children, D.R. and R.R., in the family home. At the time of the incident, D.R. was on a home visit from his placement at a psychiatric medical facility. D.R. disclosed multiple instances of sexual abuse by R.R. The parents refused to acknowledge D.R.'s statements and blamed D.R. for fabricating stories. Both D.R. and R.R. reported having access to videos of their parents engaging in sex acts. The department paused D.R.'s home visits and directed R.R. to be kept separate from the younger siblings, A.R. and G.R., in the home.

Reports of sexual behaviors between R.R., D.R., and the younger children continued to surface, but the parents denied the allegations. The parents allowed R.R. to babysit the younger siblings. In January 2023, A.R. and G.R. were adjudicated children in need of assistance. When A.R. and G.R. began therapy, they disclosed incidents of sexual abuse being perpetrated on them in the home. In April, A.R. and G.R. were removed from the home and placed in foster care.

The department requested the parents participate in therapy. Months passed, and the parents failed to meaningfully do so. The father was deceptive and uncooperative with providers. The mother refused to participate even after providers informed her the therapy would be tailored to learn her children's special needs, as opposed to addressing the mother's own childhood trauma. The mother maintained that even if she attended, she would not be engaged. She briefly attended sessions in the spring of 2024 until her insurance lapsed. The father also began engaging in therapy in the spring of 2024. Like the mother, he expressed difficulty in processing the abuse. He described the incidents as "experimental" behavior rather than sexual abuse. The parents consistently blamed others for what had occurred in their home.

The parents refused to acknowledge the ongoing and numerous incidents which took place in their home, even as the children's reports of abuse became more and more corroborated. There was also evidence the parents were aware of the sexual behaviors of the older children prior to the department's involvement. R.R. eventually admitted he had abused A.R. hundreds of times. Meanwhile, A.R. stated she would not disclose further abuse if she was returned home because she was "afraid [it] will happen again, and she doesn't want to get anybody in trouble." G.R. exhibited concerning behaviors at home and at school. He was transferred to a new placement after he sexually abused his four-year-old foster sister.

In a permanency order entered in September, the court determined neither parent had shown they had gained insight into how they would protect their

children from ongoing abuse. The court directed the State to initiate termination-of-parental-rights proceedings.

The termination hearing took place over two days in January 2025. The court heard testimony from R.R., who had turned eighteen. R.R. testified "everything came to light" after the department got involved with the family. He stated the parents "kind of brushed it off like it never really happened" and then separated him and D.R. from the other children. R.R. hoped by testifying he could help protect A.R. and D.R. "from a home that has had a lot of boundary problems, a lot of abuse . . . ." The court also heard testimony from the father's therapist, the mother's counselor, the mother, the father, and two caseworkers. The parents pointed to their recent progress and requested additional time to work toward reunification.

As of November 2024, the children had been with the same foster parents, who hoped to adopt them. G.R. had "adapted well" in the new placement and was no longer on an individualized education plan at school. A.R. still struggled with "want[ing] to go back to live with her parents," but she felt "safe" in the placement. Caseworkers opined the children did "better with limited contact" with the parents. The department and guardian ad litem (GAL) opined termination of parental rights would be in the children's best interests.

The court entered an order terminating both parents' parental rights pursuant to Iowa Code section 232.116(1)(d), (e), (f), and (i) (2024). The mother and father separately appeal.

## II.    Standard of Review

We review termination-of-parental-rights proceedings de novo.  *In re L.T.*, 924 N.W.2d 521, 526 (Iowa 2019).  Upon our review, our primary consideration is the best interests of the children, *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006), the defining elements of which are the children's safety and need for a permanent home, *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011).

## III.    Discussion

### A.    Grounds for Termination

The parents challenge all four of the grounds the juvenile court relied upon to terminate their parental rights.  "When the juvenile court terminates parental rights on more than one statutory ground," we may affirm "on any ground we find supported by the record."  *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012).  We focus on paragraph (f), which permits termination upon clear and convincing proof (1) the children are four years of age or older; (2) the children have been adjudicated in need of assistance; (3) the children have been removed from the physical custody of the parents for the time specified by statute; and (4) the children cannot be returned to the custody of the parent.  Iowa Code § 232.116(1)(f).  The mother and father challenge only the fourth element, claiming the children could be returned to their custody at the time of the termination hearing.

But the parents' testimony at the hearing belies their claims.  The father testified it would "[a]bsolutely" be problematic for A.R. and G.R. "to return home as of today" because the family had not learned to deal with "trauma, triggers, and things" so the children feel able to have a "safe place."  The father further stated the children could not be safely returned "without adequate family therapy."  He

took "full responsibility for the delay" of starting therapy, but he believed the parents were now "making significant progress." However, we note it took the father over a year into the case to acknowledge abuse had even occurred, and then he blamed others or downplayed the significant impact of the abuse on the children. For many years, the parents were aware of inappropriate sexual contact between R.R. and D.R. and other family members, including uncles who lived with the family. The parents did not stop the contact, instead treating it as a joke.[1] And the father "defined [the abuse] as experimenting rather than seeing it as an offending behavior." The mother made even less progress. She testified, "I don't remember observing any abuse." When asked at the termination hearing whether she "acknowledge[s] now that it happened," she responded, "I don't know."

The caseworker testified neither parent had shown the capacity to protect the children to enable the children to be safe from harm. The GAL opined similarly, stating in part:

> I go back to the . . . psychosocial evaluation that was done previously, where it indicated that if the parents refuse to engage in therapy to address the sexual abuse issues, then their ability to protect and provide safety for [A.R.] and [G.R.] is questionable at best. Changes must be made. Simple attendance at therapy sessions is not sufficient. Refusing to talk or participate in therapy is not seen as a meaningful permanent attempt to change behavior. The children's safety cannot be ensured under these circumstances.
> As the parents sat on the stand, they couldn't articulate what changes would truly be made.
> . . . .
> But honestly, if we were at a point where they—changes were made, they'd be able to testify to that. They'd be able to tell us where we're at. And frankly, the testimony today still shows that changes haven't been made, that attendance in therapy sessions hasn't been enough to ensure the safety of these children.

---

[1] The parents also allowed the paternal grandfather to threaten physical abuse of the children, including by intimidating them with a Taser.

Based on these and other facts replete in the record, we agree with the district court's finding the children could not be returned to the parents' custody at the time of the termination hearing. Iowa Code section 232.116(1)(f) was satisfied.

*B.      Best Interests*

Termination also must serve the children's best interests. *See* Iowa Code § 232.116(2). Under Iowa Code section 232.116(2), we "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Both parents claim termination is not in the children's best interests due to the bond the children share with the parents.[2]

"[W]e look to the parents' past performance because it may indicate the quality of care the parent is capable of providing in the future." *In re J.H.*, 952 N.W.2d 157, 171 (Iowa 2020) (citation omitted). We cannot deprive children "of permanency after the State has proved a ground for termination . . . by hoping someday a parent will learn to be a parent and be able to provide a stable home

---

[2] The mother separately claims her bond with the children should preclude termination pursuant to the permissive exception under section 232.116(3). The father does not, so we analyze his claim only as a best-interests challenge. *See In re L.A.*, ___ N.W.3d ___, ___, 2025 WL 855764, at *3 n.2 (Iowa Ct. App. 2025) (en banc) ("We interpret the father's bond-based argument as a best-interests argument rather than a permissive-exception argument because his issue heading referenced only best interests and that is the thrust of his argument.").

for the child[ren]." *In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) (citation omitted). As one caseworker testified,

> The children have been out of the home for almost two full years. They need permanency now and not to be in this unending cycle at this point.
> There are no guarantees that [the family] will ever get to the point of being able to have therapy. [There are] a lot of unknown factors, but the one thing is that known is these kids deserve permanency at this time so they can start turning the corner and healing.

We find it is not in the best interests of the children to wait for the parents to meet minimum case plan requirements at the expense of their stability and sense of security.

We further conclude that any bond between the mother and the children is not enough to overcome termination given the children's need for safety and the ability of their current placement to provide it for them. *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (declining to apply the bond exception under section 232.116(3)(c) despite "some bond between" the parent and children, as the children had been out of the parent's care for nearly two years and had "achieved stability" in another placement). Termination is in the children's best interests.

### C. Additional Time

The parents request an additional six months to work toward reunification. The court may grant a parent additional time to work toward reunification if it determines "that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." Iowa Code § 232.104(2)(b). We must consider if giving the parent more time is in the children's best interests. *See In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021). And

"[t]he judge considering [an extension] should . . . constantly bear in mind that, if the plan fails, all extended time must be subtracted from an already shortened life for the children in a better home." *In re A.C.*, 415 N.W.2d 609, 614 (Iowa 1987).

In determining whether an extension is warranted, we must decide if outstanding issues preventing reunification will be resolved in six months. Neither parent began therapy until more than one year after services were offered. By the time of the termination hearing, the father's response to what he had learned to make his home a safer environment for the children was to "[k]eep a better eye on them." The mother had declined to actively participate in therapy, and it was reported she "only has a 'vague' understanding of how her childhood sex abuse affects her parenting." The parents had not progressed beyond fully supervised visits, and A.R. appeared dysregulated after some of her interactions with the parents. Given the parents' lack of meaningful progress over the two years leading up to the termination hearing, we cannot find that an additional six months would relieve the court's concerns related to the children's safety over the long term. *See In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005) (declining to grant an extension "in part because of all the uncertainty caused by [the parent's] only recent progress and the court's inability to confirm her progress"). We decline to grant an extension.

We affirm the termination of both parents' parental rights.

**AFFIRMED ON BOTH APPEALS.**